690 A.2d 195

**COMMONWEALTH of Pennsylvania, Appellee,**

**v.**

**David G. STEWART, Jr.**

**Appeal of the ROMAN CATHOLIC DIOCESE OF ALLENTOWN, Appellant.**

Supreme Court of Pennsylvania.

Argued Jan. 23, 1996.

Decided Feb. 24, 1997.

278

Philip J. Murren, Harrisburg, Maura K. Quinlan, Harrisburg, Thomas F. Traud, Jr., Allentown, for Roman Catholic Diocese of Allentown.

Michael Dennehy, Danville, for David Stewart.

Before NIX, C.J., and FLAHERTY, CAPPY, CASTILLE, NIGRO and NEWMAN, JJ.

## OPINION

NEWMAN, Justice.

## I. INTRODUCTION

The Roman Catholic Diocese of Allentown (Diocese) appeals from the Superior Court Order affirming the Order of the Court of Common Pleas of Columbia County (trial court), requiring the Diocese to produce documents to the trial court for an *in camera* review. This case raises an unusual question concerning the application of a testimonial privilege in a homicide trial. It presents our first opportunity to consider the scope of the privilege accorded confidential communications to members of the clergy. For the reasons discussed below, we affirm.

## II. BACKGROUND

David G. Stewart, was charged with the murder of a Roman Catholic priest, Reverend Leo Heineman. In September of 1990, Stewart allegedly shot the priest to death at the Stewart home. In preparing his defense, Stewart subpoenaed documents from the Chancellor of the Diocese to support his position that he shot Reverend Heineman in self-defense. Specifically, Stewart requested Reverend Heinenman's personal records and the Diocese's records concerning the priest's alleged alcohol and/or drug abuse and sexual misconduct. Stewart argued that the church documents could help prove

that he acted in self-defense because of Reverend Heineman's purported past violent conduct.

The Diocese produced certain documents but refused to produce those kept in its secret archives. According to the Diocese, its archives contain copies of all written communications between the bishop and his priests and notes of any oral communications between the bishop and priests, deemed confidential. Thus, the Diocese filed a motion to quash the subpoena with respect to the following categories of documents:

1. All reports, letters and other documents pertaining to any allegations of misconduct or other disciplinary action regarding Reverend Heineman.

2. Copies of any reports pertaining to any sexual misconduct by Reverend Heineman.

3. Copies of all personal records, correspondence, diaries or similar documents maintained by Reverend Heineman, whether such documents were maintained at Saint Mauritius Church or other locations.

4. Copies of any reports pertaining to any alcohol or other substance abuse or treatment by Reverend Heineman from 1986 to 1989.

The Diocese claimed that the clergy-communicant privilege, 42 Pa.C.S. § 5943, which precludes disclosure of confidential information provided to members of the clergy in the course of their duties, protects the requested documents from discovery.[1] It also claimed that the compelled disclosure of documents kept in its archives pursuant to canon law would violate its right of free exercise of religion.

The trial court denied the Diocese's motion to quash the subpoena. Because the record failed to indicate whether the Diocese's representatives obtained the requested information

---

1. Pennsylvania courts have commonly referred to the privilege as the "priest-penitent" privilege. This term is used in a representative rather than a limiting manner. The statute itself identifies several classes of clergy to whom the privilege applies and broadly defines the communicant as "any person," thus including other members of the clergy. We adopt the term "clergy-communicant" privilege for purposes of this Opinion.

in confidence while acting as counselors or confessors, the court ordered the Diocese to produce the documents for an *in camera* review to determine whether the clergy-communicant privilege applies. The trial court also rejected the Diocese's free exercise argument finding that canon law does not bind the court and that Stewart's compelling interest in a fair trial outweighed the Diocese's religious claims. The Superior Court affirmed the trial court. *Commonwealth v. Stewart,* 436 Pa.Super. 262, 647 A.2d 597 (1994).

## III. *SCOPE OF CLERGY–COMMUNICANT PRIVILEGE*

The Pennsylvania statute protecting confidential information acquired by members of the clergy provides:

No clergyman, priest, rabbi or minister of the gospel of any regularly established church or religious organization, except clergymen or ministers, who are self-ordained or who are members of religious organizations in which members other than the leader thereof are deemed clergymen or ministers, *who while in the course of his duties has acquired information from any person secretly and in confidence* shall be compelled, or allowed without consent of such person, to disclose that information in any legal proceeding, trial or investigation before any government unit.

42 Pa.C.S. § 5943 (emphasis added).

In analyzing the scope of the clergy-communicant privilege, we must be mindful that evidentiary privileges are not favored. "[E]xceptions to the demand for every man's evidence are not lightly created nor expansively construed, for they are in derogation of the search for truth." *Hutchison v. Luddy,* 414 Pa.Super. 138, 146, 606 A.2d 905, 908 (1992)(quoting *Herbert v. Lando,* 441 U.S. 153, 175, 99 S.Ct. 1635, 1648, 60 L.Ed.2d 115 (1979)). Thus, courts should accept testimonial privileges "only to the very limited extent that permitting a refusal to testify or excluding relevant evidence has a public good transcending the normally predominant principle of utilizing all rational means for ascertaining the truth." *In re Grand Jury Investigation,* 918 F.2d 374, 383 (3d

Cir.1990)(quoting *Trammel v. United States,* 445 U.S. 40, 46, 100 S.Ct. 906, 910, 63 L.Ed.2d 186 (1980)).

Considering these principles, Pennsylvania courts have interpreted our clergy-communicant privilege as applying only to confidential communications between a communicant and a member of the clergy in his or her role as *confessor* or *spiritual counselor. See, e.g., Hutchison v. Luddy,* 414 Pa.Super. 138, 146, 606 A.2d 905, 908 (1992); *Commonwealth v. Patterson,* 392 Pa.Super. 331, 572 A.2d 1258 (1990); *Fahlfeder v. Commonwealth, Pennsylvania Board of Probation and Parole,* 80 Pa.Cmwlth. 86, 470 A.2d 1130 (1984).

In *Hutchison,* the plaintiff filed a civil action against a priest for alleged pedophilic acts and against the priest's diocese (collectively, the diocese) for the alleged negligent hiring and retention of the priest. During pre-trial discovery, the plaintiff sought, *inter alia,* the production of church documents concerning alleged sexual misconduct with minor male children by priests assigned to the diocese; the complete personnel files of specified priests; and documents kept by the diocese in its secret archives. The diocese refused to produce any documents contained in its secret archives.

The trial court ordered discovery of documents relating to incidents of actual or alleged sexual misconduct by priests with minor, male children and information concerning the assignment and transfer of priests. The court's Order, however, granted the church leave to present the documents for an *in camera* review before disclosure to the adverse party. After examining the relationship between canon and civil law, the statutory clergy-communicant privilege, and the constitutional right to freedom of religion, the Superior Court affirmed.

In reaching its decision, the Superior Court explained that the clergy-communicant privilege is limited to statements made in confidence to a member of the clergy for spiritual considerations or penitential purposes. The court stated that the mere fact that a communication is made to a member of the clergy, or that documentation is transmitted to a member

of the clergy, is not sufficient alone to invoke the privilege. The court concluded that the diocese had failed to show that the communicant had disclosed the requested information in confidence to a member of the clergy in the context of a confession or spiritual matter.

The *Hutchison* court relied on the *Patterson* and *Fahlfeder* cases that examined whether the privilege protects inculpatory statements to members of the clergy acting in secular roles. In *Patterson,* a murder prosecution, a court assigned a priest to the defendant as a court-appointed counselor following the defendant's unrelated arrests for indecent exposure. At trial, the priest testified concerning the defendant's desire to confess to the murder. The Superior Court found no evidence in the record indicating that the defendant had communicated with the priest in his capacity as a minister rather than as a court-appointed counselor. The court, therefore, held that because the defendant's statements to the priest were not motivated by religious considerations, the trial court properly admitted the priest's testimony.

*Fahlfeder* involved communications to a clergyman who was the director of a residence to which the petitioner had been assigned as a condition of his parole for morals crimes involving young boys. At the petitioner's parole violation hearing, the director testified that the petitioner had admitted to associating with young boys while on parole. On appeal, the petitioner alleged error in the admission of the director's testimony. The Commonwealth Court held that the statutory clergy-communicant privilege does not prohibit all testimony by members of the clergy. Instead, the court stated that it is limited to information told in confidence to the clergy in their roles as confessors or counselors. The court concluded that the record did not establish a confessor/penitent relationship between the petitioner and the director or that the petitioner offered his admissions in confidence. The court determined that the director's role toward the petitioner was that of volunteer or auxiliary supervisor to help in his rehabilitation on parole. Without a showing that the director's role was one of confessor or confidant, the court held that the challenged

admissions did not fall within the protection of the clergy-communicant privilege.

Nearly every jurisdiction in the United States has recognized a clergy-communicant privilege and, like Pennsylvania, requires the communication to have been motivated by penitential or spiritual considerations. Although the statutes establishing the privilege vary in language from state to state, the most prevalent feature prescribed by the typical statute is that the communication be made to a member of the clergy in the course of "discipline enjoined" by his or her denomination. Annotation, *Matters to Which the Privilege Covering Communications to Clergyman or Spiritual Adviser Extends,* 71 A.L.R.3d 794 (1995). Judicial interpretation of the meaning of "discipline enjoined" by the denomination has ranged from a narrow construction limiting the privilege to doctrinally required confessions, *see, e.g., Sherman v. State,* 170 Ark. 148, 279 S.W. 353 (1926), to a broader application to the practice of providing religious guidance, admonishment or advice, *see, e.g., Scott v. Hammock,* 870 P.2d 947 (Utah 1994). In either case, the privilege applies only to confidential communications to a member of the clergy acting in a spiritual capacity.

Likewise, in federal proceedings, it is stated:

[t]hat such a privilege exists . . . in at least some form has long been generally recognized, . . . . [W]hether a particular communication lies within the protection of the privilege, the courts have recognized and applied certain criteria to determine whether the communication was intended by the parties to be truly "confidential"—that is, to be kept secret from the world at large . . . and whether, granted that the communication was to a clergy person within the scope of the privilege, it was made in that person's spiritual capacity, since otherwise, they would not be deemed to be confidential.

*Russell Donaldson, J.D., Annotation, Communications to Clergyman as Privileged in Federal Proceedings,* 118 A.L.R.

Fed. 449, 457 (1996).[2]

Thus, as demonstrated in *In re Grand Jury Investigation,* 918 F.2d 374 (3d Cir.1990), federal courts have held that the federal clergy-communicant privilege protects (1) communications to a member of the clergy, (2) in his or her spiritual or professional capacity, (3) by persons who seek spiritual counseling, and (4) who reasonably expect confidentiality. *Id.* at 377. The Third Circuit has recognized that the clergy's "professional capacity" comprises a broad range of pastoral counseling practices, including family counseling and the handling of personality problems. Nonetheless, the inquiry in federal proceedings remains whether the communications at issue are confidential and spiritual in nature. *Id.*[3]

**2.** The federal rules of evidence provide that principles of common law, as interpreted by the courts "in the light of reason and experience," govern the clergy-communicant privilege Fed.R.Evid. 501. *See, e.g., In re Grand Jury Investigation,* 918 F.2d 374 (3d Cir.1990). In interpreting the federal privilege, courts have referred to the following definitions contained in proposed (but not adopted) Federal Rule of Evidence 506:

(a) Definitions. As used in this rule:

(1) A "clergyman" is a minister, priest, rabbi, or other similar functionary of a religious organization, or an individual reasonably believed so to be by the person consulting him.

(2) A communication is "confidential" if made privately and not intended for further disclosure except to other persons present in furtherance of the purpose of the communication.

(b) General rule of privilege. A person has a privilege to refuse to disclose and to prevent another from disclosing a confidential communication by the person to a clergyman in his professional character as spiritual adviser.

(c) Who may claim the privilege. The privilege may be claimed by the person, by his guardian or conservator, or by his personal representative if he is deceased. The clergyman may claim the privilege on behalf of the person. His authority so to do is presumed in the absence of evidence to the contrary.

*See, e.g., In re Grand Jury Investigation.*

**3.** With respect to what effect, if any, the presence of a third party has on the confidential status of a communication under the federal rules, the commentator Donaldson writes:

It has been held under particular circumstances that such third-party presence vitiated the requisite confidentiality, and with it the privilege for the communication, but one court has held that where the presence of the third party is necessary to the furtherance of the purpose of the communication, the requisite confidentiality is not necessarily destroyed.

Our review of the relevant case law reveals no jurisdiction extending the privilege to communications that are not penitential or spiritual in nature. Pursuant to Pennsylvania law embodied in *Hutchison, Patterson* and *Fahlfeder,* application of the clergy-communicant privilege is not based solely on the clergy's status, but whether the communication was made in confidence in the context of a penitential or spiritual matter. By seeking to eliminate the requirement of a confessional or spiritual relationship between the communicant and the clergy person, the Diocese would so broadly construe the meaning of information acquired "in the course of [a clergyman's] duties" as to effectively extend the privilege to communications involving entirely secular concerns. Contrary to the Diocese's contention, limiting the privilege to communications penitential or spiritual in nature does not "insert" non-existent language into the statute. Instead, this requirement provides a rational and well-established interpretation of confidential information acquired "in the course of [a clergyman's] duties."

We, therefore, hold that application of the privilege distills to a single inquiry: whether the communicant disclosed information in confidence to a member of the clergy in his or

118 A.L.R. Fed. 449, 458.
> Donaldson also writes:
>> On the question who may invoke the privilege, the courts have generally agreed that both the communicant himself and the clergy person who receives the communication ... may do so, and have held that a "clergyman" within the meaning of the privilege may be not only a priest to whom direct confession of sin is an obligation of the believer as in the Roman Catholic Church, but also a minister, priest, rabbi, or other similar functionary of a religious organization, including a Christian Science practitioner, or an individual reasonably believed so to be by the person consulting him or her ..., and a nun filling the office of "spiritual director" to a postulant to her order.

>> * * * * * *

>> One court has held that the right to waive the federal privilege for clergy-communicant confidences lies not with the communicant, but rather with the clergy person as the "custodian" of the confidence in question ... although it would appear that since there is considerable authority to the effect that the privilege is asserted "on behalf of" the communicant, ... a reasonable inference would be that the privilege should be waivable by the communicant as well.
> *Id.* at 457–58.

her capacity as confessor or spiritual advisor. Accordingly, confidential communications to a member of the clergy, even for counselling or solace, do not fall within the protections of the privilege unless motivated by spiritual or penitential considerations. Likewise, the privilege does not protect information regarding the manner in which a religious institution conducts its affairs; nor does the privilege protect information acquired by a religious institution through independent investigations not involving communications with a member of the clergy for penitential or spiritual purposes.

## IV. *APPLICATION OF THE CLERGY–COMMUNICANT PRIVILEGE IN THIS CASE*

■ In support of its Motion to Quash the subpoena, the Diocese alleged that the subject documents would have been obtained in confidence by the Bishop or other clergy in the course of their duties as clergy and would be maintained in the confidential diocesan archives. Specifically, the Diocese filed an affidavit of its Chancellor in support of its Motion that provides in part:

A diocesan bishop possesses all the ordinary, proper and immediate power which is required for the exercise of his pastoral office. (C. 381). In the exercise of his pastoral office, the diocesan bishop is to extend his apostolic spirit to all of the Christian faithful committed to his care to provide for their spiritual needs. (C. 383).

\* \* \* \* \* \*

The bishop fulfills these duties in conjunction with his priests, over whom he exercises hierarchical authority. Thus, a bishop maintains a special relationship with his priests. He provides primary support and guidance for them concerning their spiritual lives and the faithful performance of their mission within the Church. Free, frank and confidential communication between the bishop and his priests must be protected so that the bishop can fulfill his obligations to his priests and the faithful under the prescriptions of Canon Law. A bishop must be able to candidly discuss with a priest his character, talents, spiritual life,

health, and pastoral or familial problems and concerns in order to be able to assign the priest to compatible duties and to provide him with appropriate guidance in the conduct of his affairs and ministry to the faithful.

R.R. at 14a–15a.

The Chancellor's affidavit refers only to the hierarchical structure of the Roman Catholic Church and in general terms to the Bishop's duties. The affidavit fails to indicate whether the precise information subject to the discovery request was, in fact, acquired by the Bishop or Diocesan representatives secretly and in confidence while acting in their capacity as confessors or spiritual advisors. We cannot assume that all communications with or between members of the clergy occur in confidence and for confessional or spiritual purposes.

The affidavit fails to explain why Reverend Heineman's personal records, correspondence, diaries and other similar documents are protected by the clergy-communicant privilege. Additionally, the Diocese has not demonstrated how any letters, reports or records relating to allegations of misconduct or substance abuse of Reverend Heineman, particularly documents reflecting investigations of misconduct or disciplinary actions, fall within the protection of the privilege.

Because the Diocese failed to adequately establish that the requested information is protected by the clergy-communicant privilege, the trial court and the Superior Court properly directed the Diocese to produce the documents to the trial court for an *in camera* review.[4] *See Pennsylvania v. Ritchie*, 480 U.S. 39, 107 S.Ct. 989, 94 L.Ed.2d 40 (1987) (*in camera* review of child protective service records serves defendant's interest in fair trial without eviscerating confidentiality of child abuse investigations); *Hutchison; Commonwealth v. Cody*, 401 Pa.Super. 85, 584 A.2d 992, *allocatur denied,* 527 Pa. 622, 592 A.2d 42 (1991)(*in camera* inspection of sexual assault counselor's records proper although testimonial privi-

4. As noted by the Superior Court, the Diocese did not object to the production of documents on relevancy grounds. The trial court indicated in its Opinion, however, its intention to inspect the documents for relevancy as well as privilege.

lege of counselor is absolute); *see also In re Grand Jury Investigation* (*in camera* proceeding appropriate to determine applicability of federal clergy-communicant privilege). We hold that to the extent the requested documents reflect relevant disciplinary action, investigations of misconduct, substance abuse treatment and/or non-confessional admissions of misconduct by Reverend Heineman, they are discoverable.

## V. *FIRST AMENDMENT*

█ We disagree with the Diocese's position that the compelled production of its archival documents violates its right to the free exercise of religion as protected by the federal and state constitutions and the Religious Freedom Restoration Act, 42 U.S.C. §§ 2000bb–2000bb–4 (RFRA).[5] The government may only substantially burden the exercise of religion if it furthers a compelling governmental interest and the burden is the least restrictive means of advancing that interest. 42 U.S.C. § 2000bb–1(b). The plaintiff has the initial burden of establishing that a rule of general applicability constitutes a substantial burden on his or her free exercise of religion. *Muslim v. Frame*, 891 F.Supp. 226, 229 (E.D.Pa.1995). Once the plaintiff has satisfied his or her burden, the government must establish that the burden advances a compelling interest and is the least restrictive means of doing so. *Id.*

█ In this case, the Diocese argues that the release of archival documents, which are deemed confidential pursuant to canon law, violates its right to religious freedom. Specifically, the Diocese avers that Canon 489 of the Code of Canon

---

**5.** Congress enacted the RFRA to restore application of the "compelling interest" test established in *Wisconsin v. Yoder*, 406 U.S. 205, 92 S.Ct. 1526, 32 L.Ed.2d 15 (1972) and *Sherbert v. Verner*, 374 U.S. 398, 83 S.Ct. 1790, 10 L.Ed.2d 965 (1963) to free exercise claims. 42 U.S.C. § 2000bb(b). The RFRA, thus, statutorily overruled *Employment Division, Department of Human Resources v. Smith*, 494 U.S. 872, 110 S.Ct. 1595, 108 L.Ed.2d 876 (1990), in which the United States Supreme Court eliminated the "compelling interest" test for laws of general applicability, neutral toward religion. 42 U.S.C. § 2000bb(a). The Commonwealth questions the constitutionality of the RFRA. We do not, however, decide this issue because we conclude that, under the more stringent "compelling interest" standard, the Diocese's free exercise rights are not unconstitutionally burdened.

Law requires the maintenance of a separate archive for the safeguarding of confidential information and prohibits anyone, including the bishop, from removing documents from that archive and disclosing their contents. We do not doubt that the Diocese's refusal to produce documents in violation of canon law is rooted in a sincerely held religious belief. We find, however, that the burden on the Diocese's religious freedom furthers a compelling governmental interest by the least restrictive means available.

A defendant in a criminal case has a right to discover material evidence, *Ritchie*, and the state has a compelling interest in pursuing the truth in a criminal matter, see *Port v. Heard*, 764 F.2d 423 (5th Cir.1985). Although an *in camera* proceeding may cause a limited exposure of privileged information to the trial court, a court order limiting discovery to relevant, non-privileged documents advances this compelling governmental interest in the least restrictive way. *See Scott v. Rosenberg*, 702 F.2d 1263 (9th Cir.1983)(demand of church documents relating to specific individual's pledges necessary to further compelling governmental interest in preventing fraud).[6] Thus, consistent with the trial court and Superior Court, we hold that the compelled production of documents for an *in camera* review and the discovery of documents deemed relevant and non-privileged does not impermissibly intrude upon the Diocese's exercise of its religious beliefs and practices.

Accordingly, we affirm the Order of the Superior Court and remand this case for proceedings consistent with this Opinion.

NIX, Former C.J., did not participate in the decision of this case.

NIGRO, J., files a dissenting opinion in which CAPPY, J., joins.

6. The Diocese did not develop any separate or additional arguments under the Pennsylvania Constitution.

NIGRO, Justice, dissenting.

Because the majority has rewritten the Pennsylvania clergyman statute and restricted its application to spiritual communications, I dissent. The majority's only explanation for ignoring the statute's plain language is that other states apply the privilege to spiritual communications. Other state legislatures, however, expressly provided that the clergyman privilege applies only to spiritual communications. The Pennsylvania legislature did not.

The Pennsylvania statute protecting confidential information acquired by clergymen from discovery provides:

> No clergyman, priest, rabbi or minister of the gospel of any regularly established church or religious organization, except clergymen or ministers, who are self-ordained or who are members of religious organizations in which members other than the leader thereof are deemed clergymen or ministers, *who while in the course of his duties has acquired information from any person secretly and in confidence* shall be compelled, or allowed without consent of such person, to disclose that information in any legal proceeding, trial or investigation before any government unit.

42 Pa.Cons.Stat. § 5943 (1982)(emphasis added). The statute protects from discovery information that a religious leader acquires (1) from any person (2) in confidence (3) while in the course of his duties. It simply does not say that information is protected only when received in the course of a religious leader's duties as a spiritual advisor.

A religious leader's duties go well beyond providing spiritual advice. One may turn to a religious leader as a confidant or counsellor or for solace or other ministration. Often a religious leader is the only person one has to talk to. Religious leaders provide marital counselling. In the Catholic church, clergy conduct annulment proceedings where confidences are shared. In some communities, religious institutions fill in gaps in social services that the government is unable to provide. Aside from departing from the statute, allowing disclosure of confidential communications in these settings

may deter those who need a religious leader's support from seeking it.

If the legislature only intended to protect spiritual communications, it would have said so like other state legislatures did. *See, e.g.,* N.Y. Civ. Prac. L. & R. § 4505 (McKinney 1996) (statute protects "a confession or confidence made to [a clergyman] in his professional character as spiritual advisor"); Ohio Rev.Code Ann. § 2317.02(C)(Baldwin 1996)(statute protects "a confession made, or any information confidentially communicated, to the clergyman for a religious counseling purpose"). The law in other states, upon which the majority relies, is based upon different statutes. The majority cites no statute similar to Pennsylvania's statute that applies only to spiritual communications.

Federal cases interpreting the clergyman privilege are also inapposite. *In re Grand Jury Investigation,* 918 F.2d 374 (3rd Cir.1990), cited by the majority, looks to Proposed Rule of Evidence 506. That rule expressly protects communications in a religious leader's professional character "as a spiritual advisor." In addition, the earlier Pennsylvania decisions that the majority cites do not construe the statute. *See Hutchison v. Luddy,* 414 Pa.Super. 138, 606 A.2d 905 (1992); *Commonwealth v. Patterson,* 392 Pa.Super. 331, 572 A.2d 1258 (1990); *Fahlfeder v. Commonwealth,* 80 Pa. Cmwlth. 86, 470 A.2d 1130 (1984). Thus, none of the authorities purportedly supporting the majority's departure from the statute's plain language are persuasive.

While the Pennsylvania clergyman statute protects more than just spiritual communications, I do not believe that all of the information in the Diocese's archives is privileged. Like other privileges, only confidential communications are protected. The Diocese's documents may contain no confidential communications at all. They may also be partially discoverable if they contain confidential communications along with other information. Thus, while I would find that the Diocese need not produce documents protected by the privilege as

construed above, it must produce unprivileged documents in its archives that are responsive to the subpoena.

CAPPY, J., joins this dissenting opinion.