Darlene JOE, Mother and Administratrix of the Estate of Darlene Lucretia Joe and Rashawn Feister, Minor by his Grandmother and Legal Guardian, Darlene Joe, Individually,

v.

PRISON HEALTH SERVICES, INC., c/o CT Corporation, America Service Group, Inc., City of Philadelphia, Emilio Caucci, DO, Michael Pompey, MD, Thomas J. Costello, Jeffrey Bairstow, c/o CT Corporation, Gerard Boyle, c/o CT Corporation, Michael Catalano, c/o CT Corporation, Becky Pinney Aka Regional Vice President PRI.

Appeal of The City of Philadelphia and Prison Health Services, Inc.

Commonwealth Court of Pennsylvania.

Argued June 7, 2001.

Decided Aug. 2, 2001.

Reargument En Banc Withdrawn Sept. 25, 2001.

William D. Kennedy, Paoli, for appellants.

Raymond M. Bily, Philadelphia, for appellees.

Before DOYLE, President Judge, SMITH, Judge, and MIRARCHI, Jr., Senior Judge.

MIRARCHI, Jr., Senior Judge.

The City of Philadelphia (City) and Prison Health Services, Incorporated appeal from an order of the Court of Common Pleas of Philadelphia County (trial court) which granted a motion to compel a request for production of documents filed by Darlene Joe, Mother and Administratrix of the Estate of Darlene Lucretia Joe and Rashawn Feister, Minor by his Grandmother and Legal Guardian, Darlene Joe, Individually (collectively, Plaintiffs). We affirm.

Darlene Lucretia Joe (Decedent) was an inmate in the Philadelphia Industrial Correctional Center from February 27, 1997 through July 28, 1997. On August 4, 1997, Decedent was pronounced dead at Allegheny Hospital. On February 23, 1999, Plaintiffs brought an action against the City and its prison health subcontractor, Prison Health Services, Incorporated (Prison Health or PHS), the corporate parent of Prison Health, several officers of Prison

Health, the then-acting commissioner of Philadelphia Prisons, and two doctors. In the complaint, Plaintiffs alleged that on fifteen occasions from April 29, 1997 through June 30, 1997, Decedent requested health care services from Defendants and submitted sick call requests for recurrent headaches and related problems. The complaint alleged that Defendants failed to provide reasonable medical care and treatment to Decedent in accordance with accepted standards of medical care. The complaint further alleged that Decedent's death resulted from "primary pulmonary hypertension, cardiomegaly, hyperthyroidism, large mediastical mass and anoxic event which led to cerebral edema and cerebral herniation, the risk or presence of which were missed, ignored, undiagnosed, enhances and/or exacerbated by the defendants' care and treatment which deviated from accepted standards of medical practice." Paragraph 21 of the Complaint.

On April 26, 2000, Plaintiffs filed a motion to compel production of documents by Defendants. The motion was denied without prejudice by the trial court which instructed Plaintiffs to submit a specific request for production of documents. On May 2, 2000, Plaintiffs filed a request for the following documents:

1. All documents for 1997 from PHS which relate to care to inmates;

2. James Lawrence report;

3. DePaul reports which report a review of PHS care to inmates:

4. PHS deficiencies;

5. Completed evaluation reports;

6. Records dealing with medical record keeping problems;

7. Records involving problems with staff following up with plans to provide medical services/care;

8. Records reporting on any problem with Dr. Caucci overseeing medical care provided to inmates, during 1996 and 1997;

9. Documents regarding need to refer inmates to specialty care;

10. Documents discussing deficiencies of care;

11. Documents discussing PHS deficiencies developed by Ms. Bryant and her staff;

12. Documents concerning problems or issues with inmate referrals to sub-specialty clinics;

13. Documents referenced regarding evaluation of Dr. Caucci;

14. File inspection records of healthcare facilities at [Philadelphia Industrial Correctional Center];

15. PHS deficiencies from 1997;

16. PHS policy and procedures manual for providing health care at prison;

17. Documents concerning whether PHS was properly responding to inmate complaints.

Reproduced Record (R.R.), p. 37–38a. Each request referenced a specific location in the deposition of Rita Bryant, a healthcare coordinator for the City.

Defendants filed an answer to the request for production of documents, alleging one or more of the following objections to each request: overly broad, unduly burdensome, not reasonably calculated to lead to the discovery of evidence and requiring an unreasonable investigation. Defendants also alleged that the documents were protected from discovery pursuant to the Pennsylvania Medical Peer Review Act,[1] the attorney-client privilege, the "self-critical analysis" and "deliberative process"

---

1. Act of July 20, 1974, P.L. 564, *as amended,* 63 P.S. §§ 425.1–425.4.

doctrines.[2] On July 12, 2000, the trial court granted Plaintiffs' motion. The trial court struck the first of Plaintiffs' seventeen requests and ordered Defendants to file full and complete answers to the other requests.[3] Defendants then filed a request for reconsideration and an appeal to this Court. By order dated October 13, 2000, this Court ordered the parties to brief the issue of whether the order appealed from constitutes a collateral order pursuant to Pa. R.A.P. 313, along with the merits of the case.

■ On appeal, Defendants argue that the July 12, 2000 order is an appealable collateral order under Pa. R.A.P. 313, and that Plaintiffs' requests for production impermissibly invade the attorney-client privilege, the deliberative process privilege, the self-critical analysis privilege and the privilege established by the Peer Review Protection Act.

■ An appeal may be taken only from a final order unless otherwise permitted by statute or rule. *Ben v. Schwartz*, 556 Pa. 475, 729 A.2d 547 (1999). A final order is ordinarily one which ends the litigation or disposes of the entire case. *Id.* Under Rule 313(a), an appeal may be taken as of right from a collateral order of an administrative agency or lower court. A collateral order is defined in Rule 313(b) as "an order separable from and collateral to the main cause of action where the right involved is too important to be denied review and the question presented is such that if review is postponed until final judgment in the case, the claim will be irreparably lost."

Defendants argue that the July 12, 2000 order meets the requirements of Rule 313.

Defendants contends that the privileges which they cite, the attorney-client, the peer review, the deliberative process and the self-critical analysis privileges, are sufficiently separable from the main cause of action, raise important issues, and are subject to irreparable loss.

In *Ben*, our Supreme Court considered whether an order directing the Bureau of Professional and Occupational Affairs to produce its investigative files pertaining to complaints filed against a dentist was appealable as a collateral order. The Bureau had asserted that the information in the files was privileged and not subject to discovery. The Court first determined that the issue of privilege was separate from the merits of the underlying action for purposes of the collateral order doctrine. The Court next determined that the issue implicated rights rooted in public policy and impacted on individuals other than those involved in the litigation. Finally, the Court found that if review of the order permitting discovery of the Bureau's investigative files was postponed until final judgment in the case, the claim would be irrevocably lost.

Applying the reasoning of *Ben* to the case before us, we conclude that the July 12, 2000 order is an appealable collateral order. The privilege issues can be addressed without reference to the merits of the underlying action; the privileges asserted are sufficiently important for review; and, if the documents were disclosed, subsequent appellate review would be moot.

■ Defendants next argue that Plaintiffs' requests for production of documents impermissibly invade the privileges.

---

**2.** With the exception of the first and the sixteenth request, Defendants asserted one or more privilege to all other requests.

**3.** The trial court also ordered Defendants to provide a full and complete answer to an additional request regarding Dr. Caucci within the time period of June 1996 to June 1998.

Pennsylvania law does not favor evidentiary privileges. *Commonwealth v. Stewart*, 547 Pa. 277, 690 A.2d 195 (1997).

> '[E]xceptions to the demand for every man's evidence are not lightly created nor expansively construed, for they are in derogation of the search for truth.' *Hutchison v. Luddy*, 414 Pa.Super. 138, 146, 606 A.2d 905, 908 (1992) (quoting *Herbert v. Lando*, 441 U.S. 153, 175, 99 S.Ct. 1635, 1648, 60 L.Ed.2d 115 (1979)). Thus, courts should accept testimonial privileges 'only to the very limited extent that permitting a refusal to testify or excluding relevant evidence has a public good transcending the normally predominant principle of utilizing all rational means for ascertaining the truth.' *In re Grand Jury Investigation*, 918 F.2d 374, 383 (3d Cir.1990) (quoting *Trammel v. United States*, 445 U.S. 40, 46, 100 S.Ct. 906, 910, 63 L.Ed.2d 186 (1980)).

*Id.* at 282, 690 A.2d at 197.

### *Attorney–Client Privilege*

■ The attorney-client privilege is codified in Section 5928 of the Judicial Code, 42 Pa.C.S. § 5928, which provides that "[i]n a civil matter counsel shall not be competent or permitted to testify to confidential communications made to him by his client, nor shall the client be compelled to disclose the same, unless in either case this privilege is waived upon trial by the client." The attorney-client privilege is intended to foster candid communications between legal counsel and the client so that counsel can provide legal advice based upon the most complete information possible from the client. *Commonwealth v. Chmiel*, 558 Pa. 478, 738 A.2d 406 (1999).

The historical concern has been that, absent the attorney-client privilege, the client may be reluctant to fully disclose all the facts necessary to obtain informed legal advice if these facts may later be exposed to public scrutiny. *Id.*

■ Application of the privilege requires confidential communications made in connection with providing legal services. *Commonwealth v. duPont*, 730 A.2d 970 (Pa.Super.1999), *petition for allowance of appeal denied*, 561 Pa. 669, 749 A.2d 466 (2000). In addition, once the attorney-client communications have been disclosed to a third party, the privilege is deemed waived. *Chmiel*. The party asserting the privilege has the initial burden to prove that it is properly invoked, and the party seeking to overcome the privilege has the burden to prove an applicable exception to the privilege. *Joyner v. Southeastern Pennsylvania Transportation Authority*, 736 A.2d 35 (Pa.Cmwlth.1999).

■ Defendants assert that the attorney-client privilege is applicable to certain of the documents Plaintiffs requested.[4] Defendants have alleged that several of the requested documents were provided to the City Solicitor's office. Defendant have also alleged that City attorneys were involved in documented debates involving Prison Health's performance of duties. The attorney-client privilege protects those disclosures that are necessary to obtain informed legal advice which might not have been made absent the privilege. *Commonwealth v. Noll*, 443 Pa.Super. 602, 662 A.2d 1123 (1995), *petition for allowance of appeal denied*, 543 Pa. 726, 673 A.2d 333 (1996). The privilege only ap-

---

4. In its answer to Plaintiffs' request for production of documents, Defendants asserted the attorney-client privilege to the following requests: Nos. 3–7, 9–15 and 17. In its brief, Defendants assert the attorney-client privilege as to request No. 2, but that privilege is not asserted in its answer to Plaintiffs' request for production of documents. Accordingly, it is waived. Pa. R.A.P. 302(a).

plies where the client's ultimate goal is legal advice. *Id.* As the party asserting the attorney-client privilege, Defendants had the initial burden to prove that the privilege had been properly invoked. Defendants failed to establish, however, that any of the documents, for which they claim attorney-client privilege, were confidential communications, provided to City attorneys, for the purpose of obtaining legal advice. Accordingly, they failed to meet their burden to establish that the attorney-client privilege has been properly invoked.

*Peer Review Protection Act*

▇▇▇▇ The Peer Review Protection Act (Act) was promulgated to serve the legitimate purpose of maintaining high professional standards in the medical practice for the protection of patients and the general public. *Cooper v. Delaware Valley Medical Center*, 428 Pa.Super. 1, 630 A.2d 1 (1993), *aff'd*, 539 Pa. 620, 654 A.2d 547 (1995). The Act represents a determination by the legislature that, because of the expertise and level of skill required in the practice of medicine, the medical profession itself is in the best position to police its own activities. *Id.* The need for confidentiality in the peer review process stems from the need for comprehensive, honest, and sometimes critical evaluations of medical providers by their peers in the profession. *Young v. Western Pennsylvania Hospital*, 722 A.2d 153 (Pa.Super.1998). Without the protection afforded through the confidentiality of the proceedings, the ability of the profession to police itself effectively would be severely compromised. *Id.*

Section 4 of the Act, 63 P.S. § 425.4, pertaining to the confidentiality of review organization records, provides, in pertinent part:

The proceedings and records of a review committee shall be held in confidence and shall not be subject to discovery or introduction into evidence in any civil action against a professional health care provider arising out of the matters which are the subject of evaluation and review by such committee and no person who was in attendance at a meeting of such committee shall be permitted or required to testify in any such civil action as to any evidence or other matters produced or presented during the proceedings of such committee or as to any findings, recommendations, evaluations, opinions or other actions of such committee or any members thereof.

A "review committee" is defined in Section 2 of the Act, 63 P.S. § 425.2, to mean:

[A]ny committee engaging in peer review, including a hospital utilization review committee, a hospital tissue committee, a health insurance review committee, a hospital plan corporation review committee, a professional health service plan review committee, a dental review committee, a physicians' advisory committee, a veterinary review committee, a nursing advisory committee, any committee established pursuant to the medical assistance program, and any committee established by one or more State or local professional societies, to gather and review information relating to the care and treatment of patients for the purposes of (i) evaluating and improving the quality of health care rendered; (ii) reducing morbidity or mortality; or (iii) establishing and enforcing guidelines designed to keep within reasonable bounds the cost of health care. It shall also mean any hospital board, committee or individual reviewing the professional qualifications or activities of its medical staff or applicants for admission thereto. It shall also mean a committee of an associa-

tion of professional health care providers reviewing the operation of hospitals, nursing homes, convalescent homes or other health care facilities.

"Peer review" is defined in Section 2, in pertinent part, as:

[T]he procedure for evaluation by professional health care providers of the quality and efficiency of services ordered or performed by other professional health care providers, including practice analysis, inpatient hospital and extended care facility utilization review, medical audit, ambulatory care review, claims review, and the compliance of a hospital, nursing home or convalescent home or other health care facility operated by a professional health care provider with the standards set by an association of health care providers and with applicable laws, rules and regulations.

■■ Defendants contend that because Prison Health is a professional health care provider as defined in Section 2 of the Act,[5] any evaluations of Dr. Caucci's performance, prepared by Prison Health, are precluded from disclosure by the Act. Defendants have not established that any of the requested documents concerning Dr. Caucci were produced by a "review committee" during the course of a "peer review" as defined in the Act. Accordingly, they have not sustained their burden to establish that any requested documents are shielded from discovery by the Act.

### Deliberative Process Privilege

■■ The deliberative process privilege permits the government to withhold documents containing confidential deliberations of law or policymaking, reflecting opinions, recommendations or advice. *Commonwealth ex rel. Unified Judicial System v. Vartan*, 557 Pa. 390, 733 A.2d 1258 (1999) (plurality opinion).[6] The deliberative process privilege benefits the public and not the officials who assert the privilege. *Id.* The privilege recognizes that if governmental agencies were forced to operate in a fishbowl, the frank exchange of ideas and opinions would cease and the quality of administrative decisions would consequently suffer. *Id.*

■■ For the deliberative process privilege to apply, certain requirements must be met.

First, the communication must have been made before the deliberative process was completed.... Secondly, the communication must be deliberative in character. It must be 'a direct part of the deliberative process in that it makes recommendations or expresses opinions on legal or policy matters.' ... Information that is purely factual, even if decision-makers used it in their deliberations is usually not protected.

*Id.* at 401, 733 A.2d at 1264 (citations omitted).

■■ The deliberative process privilege should be narrowly construed. *Redland Soccer Club, Inc. v. Department of the Army*, 55 F.3d 827 (3rd Cir.1995). The initial burden of showing privilege applies is on the government. *Id.* To meet its burden, the government must present more than a bare conclusion or statement

---

**5.** "Professional health care provider" is defined in Section 2 of the Act as, *inter alia,* an administrator of a hospital, nursing or convalescent home or other health care facility or a corporation or other organization operating a hospital, nursing or convalescent home or other health care facility.

**6.** *Cf. LaValle v. Office of General Counsel of the Commonwealth*, 564 Pa. 482, ——, 769 A.2d 449, 457 (2001), "[t]his Court has not definitively adopted the deliberative process privilege."

that the documents sought are privileged. *Id.* Otherwise, the agency, not the court, would have the power to determine the availability of the privilege. *Id.*

■ Defendants argue that the deliberative process privilege applies because the documents requested were reviewed by the City as part of the City's ongoing, deliberative review of inmate health, or were generated in the course of the City's evaluation of Prison Health's performance, or were generated in order to analyze how the City, through Prison Health, could better discharge its obligation to provide health care for inmates.

We reject Defendant's broad interpretation of the deliberative process privilege. Under Defendants' interpretation, the privilege would shield any document which evaluates the performance of a contractor. The deliberative process privilege specifically contemplates that a "deliberative process" occur. In *Vartan*, a plaintiff sought to take a deposition from the former Chief Justice of the Pennsylvania Supreme Court concerning that court's decision to terminate a lease. The Court held that the deliberative process privilege could be invoked to prohibit disclosure of the deliberations of the members of that court regarding the signing of a lease and its termination. In the case before us, Defendants have not identified a "deliberative process." Instead, they merely allege an ongoing review of Prison Health's performance. Accordingly, they failed to meet their burden to establish that the deliberative process privilege applies to the requested documents.

### Self–Critical Analysis

■ The self-critical analysis privilege remains largely undefined and has not generally been recognized. *Andritz Sprout–Bauer, Inc. v. Beazer East, Inc.,*

174 F.R.D. 609 (M.D.Pa.1997).[7] The privilege is grounded on the premise that disclosure of documents reflecting candid self-examination will deter or suppress socially useful investigations and evaluations or compliance with the law or with professional standards. *Hardy v. New York News, Inc.,* 114 F.R.D. 633 (S.D.N.Y.1987).

■ Those courts which have recognized a self-critical analysis privilege have generally required that the party asserting the privilege demonstrate that the material to be protected satisfies at least three criteria: the information must result from a critical self-analysis undertaken by the party seeking protection; second, the public must have a strong interest in preserving the free flow of the type of information sought; and, the information must be of the type whose flow would be curtailed if discovery were allowed. *Dowling v. American Hawaii Cruises, Inc.,* 971 F.2d 423 (9th Cir.1992). The court in *Dowling* added the general proviso that no document would be accorded a privilege unless it was prepared with the expectation that it would be kept confidential, and has in fact been kept confidential. *Id.* The self-critical analysis privilege protects only subjective analysis designed to have a positive societal effect and does not apply to objective factual or statistical information. *Reid v. Lockheed Martin Aeronautics Co.,* 199 F.R.D. 379 (2001).

■ Defendants allege that the self-critical analysis privilege applies to reports of consultants regarding the quality of the health care services provided to inmates and memoranda of a City employee documenting her opinions and recommendations concerning prison health care. Assuming, *arguendo*, that a self-critical analysis privilege would be recognized in Pennsylvania, Defendants have not sus-

---

**7.** Defendants have not cited, nor has our research revealed, any Pennsylvania cases, other than federal court cases, which discussed a "self-critical analysis privilege."

tained their burden to establish that such a privilege would apply to the facts of this case. Defendants must establish, *inter alia*, that the information sought is of the type whose flow would be curtailed if discovery were allowed. The requested documents evaluate the performance of a City contractor. Defendants have not established that, absent the self-critical analysis privilege, the City would not evaluate the performance of Prison Health.

The order of the trial court is affirmed.[8]

### ORDER

AND NOW, this 2nd day of August, 2001, the order of the Court of Common Pleas of Philadelphia County in the above-captioned matter is hereby affirmed.

---

**8.** In its statement of questions presented, Defendants argue that the documents are exempt from discovery by the attorney-client privilege, the Peer Review Act, the deliberative process privilege and the self-critical analysis privilege. In their answer to Plaintiffs' request for documents and in their brief, Defendants asserted that certain of the requests were overly broad, unduly burdensome, not reasonably calculated to lead to the discovery of evidence, requiring an unreasonable investigation and were the reports of non-testifying experts in another case. Because these evidentiary objections were not set forth in the statement of questions presented or reasonably suggested thereby are deemed waived and will not be considered. Pa. R.A.P. 2116(a); *Allegheny County Institution District v. Department of Public Welfare,* 668 A.2d 252 (Pa.Cmwlth.1995), *petition for allowance of appeal denied,* 547 Pa. 757, 692 A.2d 567 (1997).