# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

League of Women Voters of Pennsylvania, :
Carmen Febo San Miguel, James Solomon, :
John Greiner, John Capowski, Gretchen :
Brandt, Thomas Rentschler, Mary Elizabeth :
Lawn, Lisa Isaacs, Don Lancaster, Jordi :
Comas, Robert Smith, William Marx, :
Richard Mantell, Priscilla McNulty, :
Thomas Ulrich, Robert McKinstry, :
Mark Lichty, Lorraine Petrosky, :
                          Petitioners :
                           :
          v. : No. 261 M.D. 2017
                           :
The Commonwealth of Pennsylvania; :
The Pennsylvania General Assembly; :
Thomas W. Wolf, In His Capacity :
As Governor of Pennsylvania; :
Michael J. Stack III, In His Capacity As :
Lieutenant Governor of Pennsylvania And :
President of the Pennsylvania Senate; :
Michael C. Turzai, In His Capacity As :
Speaker of the Pennsylvania House of :
Representatives; Joseph B. Scarnati III, :
In His Capacity As Pennsylvania Senate :
President Pro Tempore; Robert Torres, :
In His Capacity As Acting Secretary of :
the Commonwealth of Pennsylvania; :
Jonathan M. Marks, In His Capacity :
As Commissioner of the Bureau of :
Commissions, Elections, and Legislation :
of the Pennsylvania Department of State, :
                          Respondents :

## ORDER

       NOW, this 8th day of February, 2018, upon consideration of the

Application of Governor Thomas W. Wolf to Report Unreported Opinion and

petitioners' answer thereto, said motion is granted.  It is hereby ordered that the Memorandum and Order filed November 30, 2017 shall be designated OPINION rather than MEMORANDUM AND ORDER, and it shall be reported.


P. KEVIN BROBSON, Judge

# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

League of Women Voters of Pennsylvania, :
Carmen Febo San Miguel, James Solomon, :
John Greiner, John Capowski, Gretchen :
Brandt, Thomas Rentschler, Mary Elizabeth :
Lawn, Lisa Isaacs, Don Lancaster, Jordi :
Comas, Robert Smith, William Marx, :
Richard Mantell, Priscilla McNulty, :
Thomas Ulrich, Robert McKinstry, :
Mark Lichty, Lorraine Petrosky, :
                  Petitioners :
                   :
         v. : No. 261 M.D. 2017
                   :
The Commonwealth of Pennsylvania; :
The Pennsylvania General Assembly; :
Thomas W. Wolf, In His Capacity :
As Governor of Pennsylvania; :
Michael J. Stack III, In His Capacity As :
Lieutenant Governor of Pennsylvania And :
President of the Pennsylvania Senate; :
Michael C. Turzai, In His Capacity As :
Speaker of the Pennsylvania House of :
Representatives; Joseph B. Scarnati III, :
In His Capacity As Pennsylvania Senate :
President Pro Tempore; Robert Torres, :
In His Capacity As Acting Secretary of :
the Commonwealth of Pennsylvania; :
Jonathan M. Marks, In His Capacity :
As Commissioner of the Bureau of :
Commissions, Elections, and Legislation :
of the Pennsylvania Department of State, :
                  Respondents :


**BEFORE: HONORABLE P. KEVIN BROBSON, Judge**


**OPINION BY JUDGE BROBSON**       **FILED: November 30, 2017**

Presently before the Court for disposition is an application to quash subpoena directed to the Honorable Thomas W. Corbett (Governor Corbett), along with Governor Corbett's memorandum of law in support thereof, Petitioners' answer to the application to quash, Governor Corbett's brief in reply to the answer, and Petitioners' praecipe to supplement the record for the application to quash.

On November 22, 2017, Petitioners caused a subpoena to be served on Governor Corbett, seeking to secure his appearance at a deposition scheduled for December 1, 2017, and to compel the production of documents from Governor Corbett described in a request for production attached to the subpoena (Requests). (Application to Quash, Ex. "A".) The Requests are for "[a]ll documents referring or relating to the 2011 [Congressional Redistricting] Plan [(2011 Plan)], including, but not limited to" the following seven (7) subcategories of documents and communications relating to the 2011 Plan:

> 1. All documents referring or relating to the 2011 Plan, including, but not limited to:
>
> a. All proposals, analyses, memoranda, notes, and calendar entries in whatever medium . . . they are maintained referring or relating to the 2011 Plan.
>
> b. All documents referring or relating to all considerations or criteria that were used to develop the 2011 Plan, such as compactness, contiguity, keeping political units or communities together, equal population, race or ethnicity, incumbent protection, a voter['s] or area's likelihood of supporting Republican or Democratic candidates, and any others.
>
> c. All documents referring or relating to how each consideration or criterion was measured, including the specific data and specific formulas used in assessing compactness and partisanship.
>
> d. All documents referring or relating to how each consideration or criterion affected the 2011 Plan,

2

including any rule or principle guiding the use of each consideration or criteria in developing the 2011 Plan.

e. All communications since January 1, 2009 with any affiliate of the Republican Party, including, but not limited to, the Republican National Committee (RNC), the National Republican Congressional Committee (NRCC), the Republican State Leadership Committee (RSLC), the REDistricting Majority Project (REDMAP), or the State Government Leadership Foundation (SGLF) that refer or relate to the 2011 Plan.

f. All communications with any consultants, advisors, attorneys, or political scientists referring or relating to the 2011 Plan.

g. All communications with any committees, legislators, or legislative staffers referring or relating to the 2011 Plan.

(*Id.*)

The subpoena also lists the following seven (7) "deposition topics," relating to the 2011 Plan:

1. Governor Corbett's involvement in the creation, passage, and signing into law of the 2011 Plan.

2. Communications involving Governor Corbett referring or relating to the 2011 Plan.

3. Involvement of the REDistricting Majority Project (REDMAP), the RNC, or any non-Pennsylvania organizations with development of the 2011 Plan.

4. The considerations or criteria that were used to develop the 2011 Plan, such as compactness, contiguity, keeping political units or communities together, equal population, race or ethnicity, incumbent protection, a voter['s] or area's likelihood of supporting Republican or Democratic candidates, and any others.

5. How each consideration or criterion was measured, including the specific data and specific formulas used in assessing compactness and partisanship.

6. How each consideration or criterion or [sic] affected the 2011 Plan, including any rule or principle guiding the

3

use of each consideration or criteria in developing the 2011 Plan.

7. The goals and expected election outcomes of the 2011 Plan.

(*Id.*)

Along with the subpoena, Petitioners caused this Court's order, dated November 22, 2017, to be served on Governor Corbett.[1]

In response to the subpoena, Governor Corbett filed the subject application to quash, averring that all of the documents and/or information sought from Governor Corbett in the subpoena are protected from disclosure by a number of privileges, including the executive privilege, the deliberative process privilege, and the attorney-client privilege.

With regard to subpoenas in the context of assertions of privilege, the Commonwealth Court has explained:

> Subpoenas are one of many different discovery tools. The essential purpose of discovery is to give each side access to all information reasonably calculated to lead to the discovery of relevant, non-privileged information possessed by the other side, as well as limited access to information held by non-parties. Information, that is not otherwise privileged, is discoverable if it is both relevant and reasonable. Whether information is relevant depends upon the nature and the facts of the case, and any doubts are to be resolved in favor of relevancy.
>
> The objector to a discovery request must demonstrate non-discoverability.

---

[1] Relevant to the subpoena served on Governor Corbett, the Court, in its order dated November 22, 2017, recognized the Court's inability to compel production of testimony or documents with respect to matters protected by the legislative privilege arising under the Speech and Debate Clause of the Pennsylvania Constitution, asserted by various legislative respondents. *See* Pa. Const., Art. 2, § 15.

4

*Ario v. Deloitte & Touche, LLP*, 934 A.2d 1290, 1292-93 (Pa. Cmwlth. 2007) (internal citations omitted).

As discussed in this Court's November 22, 2017 order, the General Assembly and its staff enjoy protection from judicial interference with their legitimate legislative activities under the Speech and Debate Clause of the Pennsylvania Constitution. *See* Pa. Const., Art. 2, § 15. The Pennsylvania Constitution, however, does not expressly provide a similar protection for the executive branch of state government. Moreover, with the exception of requests made pursuant to the Right-to-Know Law (RTKL), Act of February 14, 2008, P.L. 6, 65 P.S. §§ 67.101-67.3104,[2] the General Assembly has not codified any similar privilege for the executive branch. Thus, any privilege available to a Governor of Pennsylvania necessarily must derive, to some extent, from common law doctrine or constitutional concepts.

The common law doctrine of governmental privilege for executive branch members consists largely of the executive privilege and, in some jurisdictions, the deliberative process privilege. *Van Hine v. Dep't of State*, 856 A.2d 204, 208 (Pa. Cmwlth. 2004). To the extent that these privileges exist in Pennsylvania,[3] both state and federal courts of Pennsylvania have held that the deliberative process privilege and the executive privilege are coterminous, as both "protect[] documents whose disclosure would 'seriously hamper the function of

---

[2] *See* Section 708(b)(10)(i)(A) of the RTKL, 65 P.S. § 67.708(b)(10)(i)(A).

[3] The Pennsylvania Supreme Court has expressly adopted the common law deliberative process privilege for members of the judicial branch of government. *See United Judicial Sys. v. Vartan*, 733 A.2d 1258, 1266 (Pa. 1999). In the plurality opinion in *Vartan*, our Supreme Court discussed the privilege in the context of protecting judicial branch deliberations by Supreme Court members regarding a lease for the construction of a building for the Commonwealth Court. *Id.* The Supreme Court, however, has not yet expressly adopted the deliberative process privilege for the executive branch of government.

government.'" *See id.* at 208.  The privileges, however, require somewhat different analyses.  *See id. at* 208-12.

Moreover, when it comes to use of judicial process against a Governor of this Commonwealth, the Pennsylvania Supreme Court historically has exercised restraint, given that the Governor is the head of a co-equal branch of government. *See Harding v. Pinchot*, 159 A. 16 (Pa. 1932).  In *Harding*, the Supreme Court opined:

> [I]t may be well to repeat that when we, in the past, refrained from issuing judicial process against the Governor, in deference to the fact that he represents a co-ordinate branch of the government . . . , this court did not divest itself of power to issue judicial process to him in an appropriate case.  The rule enunciated in [*Appeal of Hartranft*, 85 Pa. 433 (1877),] was that, where it was sought to compel the Governor by judicial process and he made answer that the decree prayed for would interfere with the proper performance of his executive duties, the courts would not issue mandamus to compel him to act. However, it should not be forgotten that the people are sovereign and their Constitution is the fundamental law. That Constitution provides:  'All courts shall be open; and every man for an injury done him in his lands, goods, person or reputation shall have remedy by due course of law, and right and justice administered without sale, denial or delay.' Article 1, § 11.  This court has at no time declared that, in our bounden duty to protect the Constitution and constitutional rights of Pennsylvania citizens, we may not in *extreme cases* restrain even the Governor.  Although it is true that we will not issue judicial process to the chief executive except in a case of magnitude, yet *where his action is in conflict with constitutional provisions*, it is still the law that we retain the power thus to proceed should he act unconstitutionally so as to divest private rights or dispose of public property. 'It is idle to say the authority of each branch is defined and limited in the constitution, if there be not an independent power able and willing to enforce the limitations.  From

6

its every position, it is apparent that the conservative power is lodged with the judiciary.'

*Id.* at 18 (emphasis added) (internal citations omitted).

The Supreme Court in *Harding* cited its earlier decision in *Hartranft* as the basis for the general proposition that only in "extreme cases" would the Supreme Court restrain the Governor, such as in instances "where his action is in conflict with constitutional provisions." *Id.* at 18. *Hartranft* involved the issuance of a grand jury attachment to the Governor and other executive branch officials for the purpose of investigating riots in the City of Pittsburgh. The Pennsylvania Supreme Court, in considering whether a grand jury may issue an attachment against then Governor Hartranft and other executive branch officials, noted that the grand jury attached Governor Hartranft and the other officials in their official capacities and not as citizens. The Supreme Court concluded that Governor Hartranft could not be compelled to testify under those circumstances. In so concluding, the Supreme Court opined:

> Every department of the government has its secrets of state, or privileged communications, which it is not only the right of the officers to refuse to disclose, but his duty to withhold. The official transactions between the heads of the departments of state and their subordinate officers are in general treated as privileged communications. . . . The president of the United States, and the governors of the several states, are not bound to produce papers or disclose information communicated to them when, in their own judgment, the disclosure would, on public considerations, be inexpedient.
>
> . . . .
>
> The courts cannot compel the Governor to perform any duties appertaining to his office; nor can they interfere with his discharge of them, nor control him in any matter of executive discretion.

*Hartranft*, 85 Pa. at 438-39 (citations omitted). The Supreme Court further recognized that "[t]he Governor can be punished in but one way for an abuse or misuse of his power, and that is by impeachment." *Id.* at 439.

With regard to the inquiry into the riots, the Supreme Court stated: "[I]f the Governor, as supreme executive, and as commander-in-chief of the army of the Commonwealth, is charged with the duty of suppressing domestic insurrections, he must be the judge of the necessity requiring the exercise of the powers with which he is clothed." *Id.* at 444. With regard to the duties, powers, and privileges of the Governor, the Supreme Court observed that those duties involved the constitutional power "to approve, or veto, bills submitted to him by the General Assembly." *Id.*

In *Hartranft*, the Supreme Court then asked: "Where does . . . any . . . court . . . get the power to call [the Governor] before it, and compel him to answer for the manner in which he has discharged his constitutional functions as executor of the laws . . . ?" Answering that question, the Supreme Court wrote:

> We had better at the outstart recogni[z]e the fact, that the executive department is a co-ordinate branch of the government, with power to judge what should or should not be done, within its own department, and what of its own doings and communications should or should not be kept secret, and that with it, in the exercise of these constitutional powers, the courts have no more right to interfere, than has the executive, under like conditions, to interfere with the courts. In the case of *Oliver v. Warmouth*, 22 La. 1, it was held (per Taliafero, J.), that, under the division of powers, as laid down in the federal and state constitutions, the judiciary department has no jurisdiction over or right to interfere with, the independent action of the chief executive, in the functions of his office, even though the act he is required to perform be purely ministerial. This is putting the matter on very high grounds, for, in such case, no other officer would be exempt from the mandatory power of the judiciary. No case could more forcibly exhibit the extreme reluctance of

courts to interfere with the functions of the supreme executive, for the hypothesis put is the refusal of the Governor to perform a duty, cast upon him by law, of a character strictly ministerial. We think, however, that the ground upon which this decision stands, is substantial; for, as the learned justice well argues, the difficulty arises in the attempt to establish a distinction between ministerial and discretionary acts as applied to the Governor, and then to conclude that the former may be enforced by judicial decree; it is objected, however, that the doctrine is unsound in this, that it gives to the judiciary the large discretion of determining the character of all acts to be performed by the chief executive; that this would infringe his right to use his own discretion in determining the very same question; that he must, necessarily, have the unconditional power of deciding what acts his duties require him to perform, otherwise, his functions are trammelled and the executive branch of the government is made subservient to the judiciary. The principle enunciated, in the above stated case, applies with greater force to that we now have under consideration; for if the Governor's discretion may not be interfered with, in a matter purely ministerial, much more may that discretion not be interfered with in a case which pertains to his office and duties as commander-in-chief, in the discharge of which, the constitution makes that discretion his peculiar and absolute prerogative.

*Id.* at 445-46.

As to the attachment served on Governor Hartranft, were the Supreme Court "to permit the attempt to enforce this attachment, an unseemly conflict must result between the executive and judicial departments of the government[, and] . . . prudence would dictate the avoidance of a catastrophe such as here indicated." *Id.* at 446. The Supreme Court opined:

The Governor cannot be examined as to his reasons for not signing the bill, nor as to his action, in any respect, regarding it. . . . [The Court] will make no order on him for that purpose. Such order ought not to be made against the executive of the state, because it might bring the

9

executive in conflict with the judiciary. If the executive thinks he ought to testify, in compliance with the opinion of the court, he will do so without order; if he thinks it to be his official duty, in protecting the rights and dignity of his office, he will not comply, even if directed by an order.

*Id.* at 446-47. Ultimately, the Supreme Court set aside the attachment.

Thus, the Supreme Court in *Hartranft* recognized a chief executive privilege enjoyed by the Governor, which appears to be broader (and perhaps more absolute although not entirely absolute) than the concepts of executive privilege and deliberative process privilege addressed by Governor Corbett and Petitioners. Whereas the chief executive privilege relates to the Governor, the executive and deliberative process privileges potentially available to executive branch officials, in general, are more narrow and qualified than the chief executive privilege described by the Supreme Court in 1877.

As to the continuing validity of the privilege recognized in *Hartranft*, our Supreme Court in *Costello v. Rice*, 153 A.2d 888 (Pa. 1959), cited *Hartranft*, observing that "[i]t was held more than eighty years ago by this court, under the present Constitution, that the Governor is exempt from the process of the courts whenever engaging in any duty pertaining to his office and that his immunity from judicial process extends to his subordinates and agents when acting in their official capacity." *Costello*, 153 A.2d at 892.

With regard to the executive privilege, the Commonwealth Court has noted that executive privilege is not absolute and must be demonstrated on a case-by-case basis. *Van Hine*, 856 A.2d at 208. In order to assert a claim of executive privilege, one must establish that: (1) the head of the executive agency claiming the privilege personally reviewed the material sought to be protected; (2) there is a "specific designation and description of the documents claimed to be

10

privileged;" and (3) there are "precise and certain reasons for preserving" the confidentiality of the communications. *Id.* Usually, claims of executive privilege are made by affidavit. *Id.* Thereafter, the court must "perform a balancing function," weighing "the interest of the government in ensuring the secrecy of the documents in question as opposed to the need of the private party to obtain discovery." *Id.* The relative degree of the conflicting necessities will be outcome determinative. *Id.* This analysis would appear to be applicable to both subpoenas for the production of documents and subpoenas to appear and provide testimony.

In performing this balancing function, the Commonwealth Court found guidance from the federal courts in identifying pertinent factors, known as the *Frankenhauser* factors, to consider when balancing the interests of the government in ensuring the secrecy of documents against the need of a private party to obtain discovery:

> (1) the extent to which disclosure will thwart governmental processes by discouraging citizens from giving the government information;
>
> (2) the impact upon persons who have given information of having their identities disclosed;
>
> (3) the degree to which governmental self-evaluation and consequent program involvement will be chilled by disclosure;
>
> (4) whether the information sought is factual data or evaluative summary;
>
> (5) whether the party seeking the discovery is an actual or potential defendant in any criminal proceeding either pending or reasonably likely to follow from the incident in question;
>
> (6) whether the police investigation has been completed;
>
> (7) whether any intradepartmental disciplinary proceedings have arisen or may arise from the investigation;

(8)    whether the [p]etitioner's suit is non-frivolous and brought in good faith;

(9)    whether the information sought is available through other discovery or from other sources; and

(10)    the importance of the information sought to the [p]etitioner's case.

*Id.* at 209-10 (citing *Frankenhauser v. Rizzo*, 59 F.R.D. 339, 342 (E.D. Pa. 1973)).

The deliberative process privilege permits "the government to withhold documents containing 'confidential deliberations of law or policymaking, reflecting opinions, recommendations or advice.'" *Vartan*, 733 A.2d at 1263 (plurality opinion) (citing *Redland Soccer Club, Inc. v. Dep't of the Army of the United States*, 55 F.3d 827, 853 (3d Cir. 1995)). The purpose for this privilege is to allow the free exchange of ideas and information within government agencies. *Vartan*, 733 A.2d at 1263.

The Commonwealth Court has recognized, on at least two occasions, the applicability of the common law deliberative process privilege for the executive branch. *See KC Equities v. Dep't of Pub. Welfare*, 95 A.3d 918 (Pa. Cmwlth. 2014); *Deloitte & Touche*, 934 A.2d at 129. Most recently, in *KC Equities*, the Commonwealth Court considered the appeal of a decision to revoke a certificate of compliance to operate a day care center and noted that the Department of Public Welfare, Bureau of Hearings and Appeals, properly denied a request for issuance of a subpoena, where the details sought by the subpoena were "protected by the deliberative process privilege." *KC Equities*, 95 A.3d at 934. The Commonwealth Court, in *KC Equities*, did not provide any further analysis regarding that issue. Prior to that, in 2007, this Court in *Deloitte & Touche*, held that communications between the Governor's staff and the Insurance Commissioner and her staff were part of the

12

deliberative process and, therefore, protected under the deliberative process privilege.

In determining whether the deliberative process privilege applies, the Commonwealth Court employs a three-prong analysis. *Deloitte & Touche*, 934 A.2d at 1293. The court must determine whether the communications (1) were made before the deliberative process was completed; (2) whether the communications were deliberative in character; and (3) whether the communications were a direct part of the deliberative process in that the communications make recommendations or express opinions on legal or policy matters. *Id.* (citing *Vartan*, 733 A.2d at 1264). Regarding the first and second prongs, the party asserting the privilege must show that the information is both "pre-decisional" and "deliberative." *Id.* Information is pre-decisional if it "reflects matters leading to a final decision of an agency," and the information is deliberative if it "reflects the process the agency used to reach the decision." *Id.* The government bears the initial burden to prove that the deliberative process privilege is applicable. *Joe v. Prison Health Services, Inc.*, 782 A.2d 24, 33 (Pa. Cmwlth. 2001). To meet its burden, the government must present more than a bare conclusion or statement that the documents sought are privileged; otherwise, the government agency, not the court, would have the power to determine the availability of the privilege. *Id.*

As with the executive privilege, after the initial requirements are met, the court must engage in a balancing of factors to determine whether the privilege should be applied. *Koken v. One Beacon Ins. Co.*, 911 A.2d 1021, 1027 (Pa. Cmwlth. 2006). In *One Beacon*, the Commonwealth Court again turned to *Frankenhauser* for guidance, writing:

> Such a privilege is not absolute; it must be demonstrated
> on a case by case basis. The court is called on to perform

13

> a balancing function—the interest of the government in ensuring the secrecy of the documents in question as opposed to the need of the private party to obtain discovery. The relative degree of the conflicting necessities will determine how each case is decided.

*Id.* (quoting *Frankenhauser*, 59 F.R.D. at 343 (citations omitted)). Thus, it appears that the balancing test in *Frankenhauser* may also be relevant to an analysis of the deliberate process privilege.

Importantly, the deliberative process privilege does *not* apply to factual information, "so long as the factual information is severable from the advice or underlying confidential deliberations of law or policymaking." *Deloitte & Touche*, 934 A.2d at 1293. "Purely factual information, even if used by decision-makers in their deliberations, is usually not protected" by the deliberative process privilege. *One Beacon*, 911 A.2d at 1027. Moreover, courts must narrowly construe the deliberative process privilege. *Id.*

It is noteworthy that Governor Corbett is not a party to this action. There are no allegations in the Petition for Review of any wrongdoing by Governor Corbett. Indeed, as pled, Governor Corbett's only connection to the legislation challenged in this action is set forth in paragraph 76 of the Petition for Review: "Pennsylvania's Republican Governor, Tom Corbett, signed the bill into law in time for the 2002 (sic) U.S. Congressional election." In other words, Governor Corbett's only alleged connection to this lawsuit is that he exercised his express power under Article IV, Section 15 of the Pennsylvania Constitution to approve or veto legislation:

> Every bill which shall have passed both Houses shall be presented to the Governor; if he approves he shall sign it, but if he shall not approve he shall return it with his objections to the House in which it shall have originated,

14

which House shall enter the objections at large upon their
journal . . . .

At base, this action is a constitutional challenge to legislation[4] enacted by the General Assembly and signed into law by the then-sitting Governor of the Commonwealth of Pennsylvania. Although this particular legislation is unique in that it relates to a subject that arises once every ten years (or so), this Court routinely hears and decides challenges to allegedly unconstitutional legislation signed by a Governor. Moreover, in terms of the subject matter, the General Assembly is the branch of state government constitutionally charged with power and duty to draw the congressional districts,[5] not the Governor. The Governor merely approves, vetoes, or fails to act the legislative bill setting Congressional districts as sent to him by the General Assembly.

Relying on the precedent set forth above, the Court concludes that with respect to his connection to Act 131 of 2011, Governor Corbett is clothed in the chief executive privilege set forth in *Hartranft*. This privilege protects a Governor (current and former) from state court compulsion to give testimony or produce records in legal proceedings challenging the constitutionality of legislation where the chief executive exercised his constitutional authority to act on legislation presented to him by the General Assembly. The chief executive privilege implicates higher or greater separation of powers issues than those encompassed in the lesser executive and deliberative process privileges. As the Supreme Court explained in *Harding*, it "will not issue judicial process to the chief executive except in a case of

---

[4] The Congressional Redistricting Act of 2011, Act of December 22, 2011, P.L. 599, 25 P.S. §§ 3596.101-.150 (Act 131 of 2011).

[5] "The Times, Places and Manner of holding Elections for Senators and Representatives, shall be prescribed in each State by the Legislature thereof; but the Congress may at any time by Law make or alter such Regulations . . . ." U.S. Const. art. I, § 4.

15

magnitude," such as "where his action is in conflict with constitutional provisions." To hold otherwise would subject a Governor to unconstitutional interference in his exercise of his constitutional powers and duties and subject him to examination on every piece of legislation that the General Assembly enacts, thereby creating potential for conflict between co-equal branches of government.

Petitioners have not offered any precedent, let alone a compelling interest or need, to convince this Court that it should compel a former Governor to appear, produce documents, and testify in a lawsuit challenging the constitutionality of legislation that he approved as Governor under his sole constitutional authority. Moreover, Petitioners do not identify an action in conflict with constitutional provisions pertaining to the executive branch in which Governor Corbett engaged, let alone any action of such a magnitude as to warrant this Court's interference as required by *Harding*. As important as this case is, Petitioners offer nothing to the Court that would justify such an exertion of judicial authority over the Commonwealth's chief executive, whether current or former. Pa. Const. art. IV, § 1 ("The supreme executive power shall be vested in the Governor . . . .").

AND NOW, this 30th day of November, 2017, with the foregoing legal principles in mind, the application to quash subpoena directed to the Honorable Thomas W. Corbett is hereby GRANTED, and the subpoena is QUASHED.

_____
P. KEVIN BROBSON, Judge

16